Filed 10/2/13  P. v. Hall CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DEMAGEO HALL,<br><br>    Defendant and Appellant. | B237349<br><br>(Los Angeles County<br>Super. Ct. No. YA077726) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Steven R. Van Sicklen, Judge.  Affirmed as modified.

Law Offices of Allen G. Weinberg and Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle, Russell A. Lehman, and Mark Weber, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Demageo Hall (defendant) challenges his murder and attempted murder convictions, asserting instructional error and prosecutorial misconduct. He also contends that the trial court erroneously described his sentence on the attempted murder, and that he is entitled to seven more days of presentence custody credit. We find no error in the instructions and no prosecutorial misconduct. We modify the sentencing on count 2, but find that defendant has not shown he is entitled to additional custody credit. We affirm the judgment as modified.

## BACKGROUND

**Procedural history**

Defendant was charged in count 1 with the murder of Dante Nolan (Nolan) in violation of Penal Code section 187, subdivision (a).[1] In count 2, defendant was charged with the attempted willful, deliberate, premeditated murder of Gregory Davis (Davis) in violation of sections 664, subdivision (a), and 187, subdivision (a). It was further alleged as to both counts that defendant personally used a firearm within the meaning of section 12022.53, subdivision (b); that he personally and intentionally discharged a firearm, causing great bodily injury and death within the meaning of section 12022.53, subdivisions (c) and (d); and pursuant to section 186.22, subdivision (b), that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members.

The jury found defendant guilty of both counts as charged and found true the special allegations. On November 17, 2011, the trial court sentenced defendant on count 1 to a term of 25 years to life in prison, plus a consecutive 25 years to life due to the firearm enhancement. As to count 2, defendant was sentenced to a consecutive term of 15 years to life in prison, plus a consecutive 25 years to life for the firearm enhancement. The court imposed mandatory fines and fees and awarded defendant 587 actual days of presentence custody credit. Defendant filed a timely notice of appeal from the judgment.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

2

**Prosecution evidence**

Davis and Nolan were shot sometime between midnight and 1:00 a.m. on February 28, 2009, as they left a party on 107th Street near Normandie Avenue. The area just west of Normandie Avenue was territory claimed by the Underground Crip gang. The area east of Normandie Avenue was claimed by the Hoover Criminals gang, also known as the Hoover gang or the Hoovers. Hoover gang members did not get along with the Underground Crips, whom they called by the derogatory term "Ugly Girls" or "U.G.'s" for short. Defendant was a member of a subset or clique of the Hoover gang.

Davis testified he and Nolan had been invited to the party on 107th Street by his nephew. They did not stay long as the attendees were in their 20's, much younger than Davis and Nolan. Davis was not a gang member, was not from the neighborhood of the party, and did not know there was a gang rivalry in the area. As Davis was in the street about to get into his car on the driver's side, and Nolan was standing on the sidewalk waiting to get in on the passenger side Davis saw a "Black kid" across the street, about 38 to 40 feet away. The kid, whom Davis identified in court as defendant, looked at them and then fired a gun in their direction. Davis had an unobstructed view of defendant and the street was brightly lit by streetlights. When detectives interviewed Davis in October 2009, he was able to select defendant's photograph from a photographic lineup and identify him as the shooter. Davis also identified defendant at the preliminary hearing.

Davis was shot three times in the abdomen before he and Nolan turned and ran back in the direction of the party house. Davis took cover under a truck parked in the driveway of the house while Nolan tried to climb the fence. As Davis ran, he was struck by five more bullets in his back, wrist, and thumb. As he hid under the truck with one foot protruding, defendant approached and shot Davis again in his foot.

Nolan was struck by three bullets. One of the bullets passed through his liver and heart, killing him within minutes. Davis underwent surgery and remained hospitalized for five weeks. At the time of trial, Davis remained in physical therapy, still suffered from a bulging disc caused by a bullet strike near his spine, and attended a pain management class.

Los Angeles County Sheriff's Department Homicide Detective Richard Ramirez investigated the shooting. The case remained unsolved for several months because of an inability to obtain much information from Davis due to his medical condition. Detective Ramirez arranged to have the case profiled on the television program "L.A.'s Most Wanted" in early October 2009. Nolan's mother, sister, and uncle appeared on the show and appealed to the public for information. A photograph of Nolan was displayed during the broadcast. The photograph showed Nolan in braids, the hairstyle he wore at the time of his death.

Not long thereafter, Sergeant Mark Marbach contacted Detective Ramirez with information received from a paid "confidential reliable informant" (CRI), Hebert Zamora (Zamora).[2] Based upon Sergeant Marbach's information, Detective Ramirez was able to put together the six-pack photographic lineup from which Davis selected defendant's photograph.

Zamora had been an 18th Street gang member since the age of 13 years and was known as "Midget." He later moved to the neighborhood that included the area claimed by the 11 Deuce Hoover subset of the Hoover gang. Zamora testified he was able to obtain information about Hoover gang members because he associated with some of them and his mother-in-law had once associated with the Hoover gang. Zamora knew defendant as a Hoover gang member whose moniker was "Tiny Snaps." In October 2009, Zamora was driving around with defendant, "Bam Bam," and "Tiny Box," two members of the 107 Hoovers, another subset of the Hoover gang. Defendant pointed out a house on 107th Street near Normandie Avenue and said there had been a party there awhile back; defendant told Zamora that when he saw two "Ugly Girls" walking out of

---

[2]  Although the reporter's transcript contains multiple spellings of Zamora's first name, Zamora himself spelled it "Hebert" prior to his testimony. For several years Zamora had provided Sergeant Marbach with information that proved reliable. He also worked as a paid informant for several federal agencies. Prior to the preliminary hearing, Zamora received a telephone call from a Hoover gang member who told him that "they" knew that he had been working as an informant and would catch him and "smoke" him. Sergeant Marbach arranged to have Zamora and his family relocated out of state.

4

the house, "we had to shoot 'em or whatever."  Defendant said that once the two men were outside the house, he said, "Fuck Ugly Girls," and started shooting.

Defendant told Zamora he was with another "homeboy" who acted as a lookout at the time, but defendant did not give a name.  The homeboy waited at the corner watching for the police while defendant shot the two men.  Defendant then ran through an alley, disposed of the gun, and walked back to the crime scene to watch the police taping the area.  Zamora testified it was a normal practice of gang members to go back to the scene to determine whether the victim had died.  It was also normal for gang members to brag about committing such crimes as shootings, drug sales, and walk-up murders, because they served to enhance the reputation of the perpetrator within gang, and to intimidate neighborhood residents and rival gang members.  Such crimes were known as "putting in work" for the gang.  Zamora testified that a gang member would not brag falsely because other gang members would investigate and impose a "strike" on the member who claimed to have committed someone else's crime.

Sometime later defendant complained to Zamora that the victim's sister or mother had made "a big deal out of the shooting" and she had to be stopped.  The next day Zamora contacted Sergeant Marbach.  Defendant was arrested in early October 2009 for a gang injunction violation while he was in the company of Kevin Adams and another man.  Later that month, while defendant was in custody, Detective Ramirez arranged to have defendant placed near CRI Cleveland Ross (Ross), another Hoover gang member who was also in custody.  Just prior to placing defendant in the informant's cell, Detective Ramirez and his partner interviewed defendant and informed him he was suspected of shooting Davis and Nolan.  Defendant's interview was recorded and played for the jury.  Defendant's nearly five-hour conversation with Ross was also recorded and portions of it were played for the jury.

Before being placed near Ross, defendant gave his name, age, address and other information to a deputy sheriff; he told the deputy that he was called "Slim" and associated with "One Twelve Hoover."  When speaking to Ross, defendant said, "They called me off to homicide.  I don't know -- Little Kevin . . . snitched on us."  Twice more

5

in the conversation, defendant guessed that Kevin or "they" had snitched on him.  Later, defendant sang, "I love Hoover" and "Hoover loves me."  He also said, "The detectives fucked up.  They didn't fingerprint me."

In April 2010, Sergeant Marbach told Detective Ramirez about another incarcerated informant, a gang member known as "Kill Kill," who had agreed to cooperate in exchange for leniency in his case.[3]  Detective Ramirez briefed Kill Kill on some of the facts of the shooting:  that it had occurred in February 2009 on 107th Street as two men, one wearing braids, walked out of a party.  In order to stimulate a conversation with the informant, Detective Ramirez told defendant that he had been identified as a suspect in the shooting.  The detective then had defendant placed in the same cell as Kill Kill.

A recording of defendant's conversation with Kill Kill was played for the jury.  At the beginning of the conversation, defendant told Kill Kill he was "Baby Snap" and "from 112 Street Hoover."  Defendant thought his "homies" might snitch on him and said, "I know that nigger from UG that died. . . .  His mama know my auntie."  Later, when Kill Kill asked, "You sure didn't nobody see you right?" defendant said, "I don't know, man.  I do my shit in -- I don't never -- do you feel me?  I'm a type of foot type nigger, you know."  This prompted Kill Kill to suggest he was a "JOB," to which defendant replied, "Do you feel me?"  When Kill Kill suggested, "Look, one of the niggers had braids, huh?" defendant confirmed, "Yeah."

Gang expert Detective White explained that "JOB" meant "jump out boy" and was a term used for gang members who had been involved in several shootings, whether by jumping from a car or shooting on foot.  It was his opinion that defendant was a member of the 11-Deuce Hoovers criminal street gang, based upon defendant's admission to Kill Kill, his documented contacts with law enforcement, and defendant's gang-related

---

[3]     Kill Kill had been a CRI, but lost that status when he was charged with residential burglary.  He was not identified at trial but testified as "John Doe" when called by the defense.

6

tattoos. Detective White also testified regarding gang culture, giving his opinion that the Hoover Criminals gang and its sets were criminal street gangs, whose members' primary activities included murder, attempted murder, assault, narcotics sales, weapons violations, robbery, and graffiti-related vandalism. He presented certified records of several Hoover gang members convicted of such crimes. Given hypothetical facts based upon the evidence in this case, Detective White opined that the shooting of the victims in this case was committed for the benefit of the Hoover Criminals gang.

**Defense evidence**

The defense recalled Detective Ramirez, who testified that during an interview Zamora said that defendant had been seated in the back seat when they discussed the shooting. At trial, Detective Ramirez testified that Zamora said he had been in the front passenger seat.

Iris Garcia (Garcia) testified she lived in a second floor apartment on 107th Street and was awake when the shooting took place. She heard gunshots, looked into the street, saw a dark blue car with the front and rear windows open on the driver's side, and saw gunfire flashes emanating from the windows. She thought the car was a Mercedes Benz.[4] After she saw a young man fall, the blue car left toward Normandie Avenue. Garcia gave this information to a deputy sheriff on the scene that night and spoke to Detective Ramirez by telephone in March 2010. Although there was a tree between her apartment and the location of the shooting, Garcia denied that it blocked her view. She explained that some branches had been removed from the tree.

Deputy Roberto Reyes took Garcia's initial report. He testified Garcia told him she heard a gunshot, looked out her window, saw someone, and then she heard and saw four or five more shots coming from a newer model dark blue Mercedes with tinted

---

**4** Zamora testified that he owned a 1996 Mercedes Benz which he bought sometime in 2008. Defense counsel argued in summation that Zamora owned a blue Mercedes and suggest that he was the getaway driver for other gang members who shot Davis and Nolan. Although Sergeant Marbach had testified that Zamora's Mercedes was dark in color, the actual color of his car was not in evidence.

7

windows. She told him she saw the driver and a front passenger, both Black males, and after the gunfire stopped, the car sped away eastbound.

Defendant's cousins Myiesha Hall (Hall) and Latrice Wilson (Wilson) testified that in February 2009, they lived in the same apartment complex in San Bernardino, and that defendant lived with Hall during all or part of February until after the first of March. Both cousins testified that on February 28, 2009, during the time that defendant was staying with Hall, Wilson gave a "smoke out" party that lasted from 8:00 p.m. until about 2:00 a.m. The two women remembered the date because Hall kept a calendar of events and wrote "smoke out" on that date. Hall testified that she, defendant, Wilson, Renee Hall, Tricia Lewis, and David Atkins attended the party.

Hall was "100 percent certain" that defendant came to stay with her two weeks before the end of February and she remembered he left at the beginning of March, on the day of a memorial for her young cousin who had died in 2008. Hall's ex-boyfriend, Gregory Haynes, drove defendant from Los Angeles. Hall acknowledged that she told the defense investigator in February 2011, that the memorial had taken place in Carson on March 23, 2009. Hall denied knowing or telling the investigator that defendant was known as Tiny Snaps or Baby Snaps, or saying, "Let's just leave that part out" when the investigator asked how many years defendant had used the name. Hall admitted she was acquainted with Tiny Box and Bam Bam, both members of the 107th Street Hoover Crips.

Wilson also testified that defendant came to stay with Hall about two weeks before the smoke out party and left during the first week of March. Wilson claimed she did not know that defendant was a gang member, and did not learn that he had been accused of murder until the defense investigator told her on February 8, 2011.[5] Wilson explained she did not contact law enforcement because she gave her information to the defense investigator and there was nothing more she could do.

---

[5] Defendant's preliminary hearing had taken place in August 2010.

John Doe, the informant known as Kill Kill, testified he did not know Sergeant Marbach or Detective Ramirez, never worked as an informant, and had no information about this case. He claimed to have little memory of his conversation with defendant and denied knowing it had been recorded.

Ross also denied being an informant in this case. He admitted he was a member of the 107th Hoover gang, but denied knowing defendant in 2009. Ross remembered that while he was in jail, homicide detectives interviewed him and showed him an obituary photograph. The detectives suggested that Ross had murdered the man in the picture, and then placed Ross in handcuffs next to defendant. Ross denied trying to elicit information from defendant or knowing anything about a murder on 107th Street on February 28, 2009. Although he remembered he and defendant had a conversation, he could not remember what they discussed, and did not know the conversation was recorded.

**Rebuttal**

Robert Gil (Gil), the defense investigator who interviewed Hall and Wilson on February 8, 2011, testified that when he telephoned them a week before the interview, both women were aware that defendant had been charged with murder. Hall said that defendant came to stay with her toward the end of January or beginning of February 2009, and remained until the family memorial in Carson on March 23, 2009. Hall said she knew Midget and that defendant associated with him. She acknowledged that defendant was known as Baby Snaps in the past, but when the investigator asked how long he was known by that name, she said, "Let's just leave that part out." Wilson said defendant arrived in February, stayed one month, and attended both the birthday party for Lavonte Mecan and the smoke out. She named five guests in addition to defendant and Hall.

Gil interviewed Garcia in Spanish in February 2011. Garcia said that she saw the gunfire flashes from a dark blue Mercedes, but also said she saw the letters "BMW" on the trunk as the car drove away. Garcia could not see into the car because of the tinted window and she was unable to see how many people were in the car, or what they looked like.

9

Sheriff's Sergeant Dana Ellison identified defendant in court, and testified about an encounter with defendant in March 2009. Defendant was in the company of three others and gave his name as Jayveon Crumby and his gang affiliation as 5-Deuce Hoover. He also gave a false birth date, height, and weight. Detective Ramirez presented two booking photographs of defendant. The 2009 record named Jayveon Crumby, did not bear a fingerprint, and recorded defendant's height as five feet nine inches. Defendant's true name, a fingerprint, and his correct height of six feet appeared in the 2010 record.

Detective Ramirez testified that he had never heard of Hall and Wilson until they were first identified as witnesses for the defense in September 2011, shortly before trial. When he interviewed them on September 16, 2011, Hall claimed that defendant had stayed with her during January and February 2009, and they attended the smoke out party together, along with about 12 other people. Hall denied that her boyfriend Greg attended the party and claimed she could not recall Greg's last name. Wilson told Detective Ramirez that Hall and her boyfriend Greg arrived at the party together and that defendant arrived alone. She could not remember what time they arrived.

Detective Ramirez also testified he spoke to Garcia by telephone on March 6, 2010. She told him she saw a blue Lexus drive rapidly away from the location after the shooting with two African-Americans in the car, who she could not see clearly enough to identify. Shortly before trial Detective Ramirez took photographs of the crime scene from Garcia's window, including the tree which was in the same full and healthy condition as it appeared in aerial photographs taken of the crime scene a few days after the shooting.

## DISCUSSION

### I.  CALCRIM No. 372

Defendant contends that the trial court erred in giving CALCRIM No. 372 over defense counsel's objection. CALCRIM No. 372 as given reads:

> "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of

10

that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Section 1127c requires a trial court give a flight instruction when there is evidence of defendant's flight. Defendant admitted to Zamora that he ran from the scene through an alley after shooting the victims. Nevertheless, defendant argues that a flight instruction should not be given in cases where the defense presents evidence of misidentification or when the defendant's identification is a contested issue. To support his contention, defendant relies on "broad dictum" in *People v. Anjell* (1979) 100 Cal.App.3d 189, 199-201 (*Anjell*).**6** *Anjell* and its progeny were overruled by the California Supreme Court in *People v. Mason* (1991) 52 Cal.3d 909, 943, footnote 13 (*Mason*). (See also, *People v. Pensinger* (1991) 52 Cal.3d 1210, 1245; *People v. Jones* (1991) 53 Cal.3d 1115 (*Jones*).) It is established that even when identity is contested, "it is proper for the trial court to instruct on flight if 'there is evidence identifying the person who fled as the defendant, and if such evidence "is relied upon as tending to show guilt" . . . .' [Citation.]" (*Jones, supra*, at pp. 1144-1145, quoting *Mason, supra*, at p. 943; see also *People v. Pensinger, supra*, at p. 1245.) The jury's need to "'know that it is entitled to infer consciousness of guilt from flight and that flight, alone, is not sufficient to establish guilt . . . does not change just because identity is also an issue.'" (*Mason, supra*, at p. 943; § 1127c.)

Here, the prosecution presented substantial evidence of defendant's identity as the shooter. Davis identified defendant in a photographic lineup, at the preliminary hearing, and at trial. Confidential informant Zamora testified that defendant bragged about the crime, showed him where it happened, indicated there had been a lookout, and said he had run through the alley to dispose of the gun before returning to watch the police

---

**6** The court in *Anjell* stated: "The fact that the perpetrators fled the scene of the crime cannot warrant an instruction on flight where identity is a contested issue." (*Anjell, supra*, 100 Cal.App.3d at p. 199.) The court held that a flight instruction was improper in the absence of substantial evidence of flight. (*Id*. at p. 201.)

11

process the crime scene.  When told he was going to be charged with murder, defendant told his cellmate that Kevin must have snitched on him.  A flight instruction was thus proper and required.  (*Jones, supra*, 53 Cal.3d at pp. 1144-1145.)

Defendant contends that the California Supreme Court's analysis is unpersuasive and should be rejected in favor of *Anjell*'s dictum, because the instruction required the jury to *assume* that he was the perpetrator.  We have no authority to do as defendant asks.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Moreover, defendant's contention is without merit.  A reasonable juror following the instruction could not logically find that defendant fled, without first finding that it was the defendant who fled.  (*Mason, supra*, 52 Cal.3d at p. 943.)

Defendant also contends that the instruction impermissibly allowed the jury to infer from his flight that he had committed the offense.  Similar claims have been rejected by our high court, which has made clear that such an instruction does not create a mandatory presumption or require the jury to draw inferences.  (See *People v. Loker* (2008) 44 Cal.4th 691, 706; *People v. Mendoza* (2000) 24 Cal.4th 130, 180-181.)

Finally defendant argues that allowing the jury to infer guilt from flight improperly undercut his alibi defense -- that he was with his cousins in San Bernardino on February 28, 2009.  It was the ample evidence of defendant's identity as the shooter, not defendant's flight that undercut his alibi.  The instruction did not require, but merely permitted an inference that flight from the crime scene by the person identified as defendant demonstrated an awareness or consciousness of guilt.  We conclude the instruction was correct and properly given.

## II.  Improper argument

It is defendant's position that the following argument by the prosecutor was improper and violated defendant's right to due process:  "Mr. Nolan and Mr. Davis were two people who were not part of that world.  They were there for a party.  But because of the battlefield that gang members have made in our cities and our neighborhoods, Mr. Nolan lost his life and Mr. Davis almost lost his life.  That is because of this battlefield that -- [defense objection overruled] -- because of this battlefield that these gang

12

members have made of our cities and our neighborhoods.  Mr. Davis, when he decided to be truthful and cooperate with the police, and tell the truth every time he was asked to do so, took a step towards taking back the streets from the gang members."

After this statement, the trial court immediately overruled another defense objection, finding the argument "goes to motive"; the prosecutor then concluded her opening summation.

Respondent argues defendant has forfeited the issue by not stating the ground of his objections in the trial court or requesting an admonishment.  (See *People v. Lopez* (2013) 56 Cal.4th 1028, 1073.)  There is no forfeiture however, where a request would have been futile or the court immediately overruled the objection, giving defendant no opportunity to request an admonition.  (See *People v. Hill* (1998) 17 Cal.4th 800, 820-821.)  Defendant contends this rule applied to preserve the issue.  Regardless, we find no misconduct.

A prosecutor's improper remark does not violate the federal constitution unless it is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.  (*People v. Hill* (1998) 17 Cal.4th 800, 819; see also *Darden v. Wainwright* (1986) 477 U.S. 168, 181.)  Otherwise, misconduct violates state law only if the prosecutor has used deceptive or reprehensible methods to attempt to persuade either the court or the jury.  (*Hill, supra*, at p. 819.)

Defendant claims the remarks were intended to prey on jurors' fear of gangs and to exploit their fear by encouraging a guilty verdict in order to protect the community.  An argument that is calculated to excite prejudice or passion is improper, and "'[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking.'"  (*People v. Redd* (2010) 48 Cal.4th 691, 743, fn. 25, quoting *U.S. v. Monaghan* (D.C. Cir. 1984) 741 F.2d 1434, 1441-1442.)

An occasional colorful metaphor easily understood as such is not misconduct.  (See *People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203 [torture by burning compared to Spanish Inquisition].)  Further, is not reasonably probable that the jurors construed

"taking back the streets" as an exhortation to ignore the evidence and the court's instructions. The prosecutor made clear she was not asking that of the jurors. Immediately after the trial court overruled defendant's second objection to this statement, the prosecutor said: "Mr. Davis did his part as a citizen of our community. And it's now your turn to do yours. And your duty is to objectively and rationally *look at each piece of evidence*. And it's also to *follow the law as it's been given to you, regardless of how you feel about the law*." (Italics added.)

Moreover, a single comment of this sort is not misconduct unless it formed the basis of the prosecutor's argument, considered as a whole, and resulted in prejudice. (See *People v. Wash* (1993) 6 Cal.4th 215, 262.) Defendant objected to this one remark only, which came after unobjectionable argument over more than 30 pages of reporter's transcript. Following the defense summation, the prosecutor argued nearly half that long without a defense objection. Similar isolated comments have been found not to amount to misconduct. (See, e.g., *Id.* at pp. 261-262 ["'make a statement'"]; *People v. Lang* (1989) 49 Cal.3d 991, 1041 ["your opportunity" to "have a voice in your community"]; *People v. Adanandus* (2007) 157 Cal.App.4th 496, 511-512 ["your verdicts . . . can restore order" and "restore justice to that street"]; *People v. Escarcega* (1969) 273 Cal.App.2d 853, 862-863 ["make an example of defendant" and reverse society's permissive trend].)

The prosecutor's remarks in this case were no worse than others cited and we find no misconduct. Assuming however, the argument amounted to misconduct, it was harmless. Defendant contends the applicable standard of review is that of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), under which federal constitutional error requires reversal unless it was harmless beyond a reasonable doubt. Not all improper remarks result in a denial of due process, and "it 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' [Citation.]" (*Darden v. Wainwright, supra*, 477 U.S. at pp. 181-182.) A single improper comment in a lengthy argument does not render a trial fundamentally unfair under the federal constitution, which would require a *Chapman* analysis; instead it is reviewed under the standard of

14

*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323; see *People v. Pensinger, supra*, 52 Cal.3d at p. 1250.) Under the *Watson* standard, prosecutorial misconduct is harmless unless there is a reasonable probability that the error affected the outcome. (*Bordelon, supra*, at p. 1324.)

As the comment was brief, made at the close of the initial argument, and easily recognizable and discounted as hyperbole, it is unlikely to have affected the outcome. (See *People v. Sandoval* (1992) 4 Cal.4th 155, 184; *People v. Poggi* (1988) 45 Cal.3d 306, 340.) Further, the trial court instructed the jurors not to let bias, sympathy, or public opinion influence their decision, and said: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The court also told the jury: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. . . . Only the witnesses' answers are evidence." Because there was a single arguably improper comment, such instructions were sufficient to attenuate any prejudice. (See *People v. Cash* (2002) 28 Cal.4th 703, 733; *People v. Hughey* (1987) 194 Cal.App.3d 1383, 1396.) We conclude that a more favorable result for defendant would not have been reasonably probable here in the absence of the prosecutor's comment, thus any error in overruling defendant's objections was harmless.

## III. Ambiguous sentence

Defendant contends the trial court erroneously stated his prison sentence on count 2 as 15 years to life plus 25 years, for a total of 40 years to life, rather than as a life term with a 15-year minimum parole eligibility period as required by section 186.22, subdivision (b)(5), plus 25 years for the firearm enhancement.[7] He claims that the sentence must be restated.

---

[7]    The punishment for premeditated attempted murder under section 664, subdivision (a), is "life with the possibility of parole" with a minimum term before parole eligibility of seven years. (See § 3046, subds. (a)(1) & (a)(2); *People v. Salas* (2001) 89 Cal.App.4th 1275, 1280.) Pursuant to section 186.22, subdivision (b)(5), the gang

A sentence under section 186.22, subdivision (b)(5), is not unauthorized simply because the trial court used the shorthand, "15 years to life"; or because the court refers to the total term as "40 years to life" when also imposing a 25-year firearm enhancement. (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1228-1229; see *People v. Montes* (2003) 31 Cal.4th 350, 361, fn. 14 ["The question of whether such a characterization is appropriate is not before us and we express no opinion on the matter"].)

Here, the trial court stated: "As to count 2, the attempted murder count, the court is going to impose a total of 25 years to life calculated as follows: the attempted murder along with the gang allegation is a 15 years to life sentence. An additional 25 years is added to that pursuant to the 12022.53(d) allegation, as to that count. So as to count 2, it's a total of 40 years to life." It appears the court's initial statement that the term would be 25 years to life was most likely a misstatement which the court corrected to 15 years to life but failed to do so expressly. Nevertheless, as respondent agrees with defendant, and since the possibility exists that the court meant to impose an enhancement under section 186.22, subdivision (b)(1)(C), we modify the judgment to eliminate any ambiguity.

It also appears the court's reference to the gang allegation and its failure to clarify its mistake or mention the 15-year minimum parole eligibility period led the clerk to state erroneously in the minutes that the sentence of 15 years to life was imposed "as enhanced by the 186.22(b)(1)(C) Penal Code allegation." The abstract of judgment sets out the sentence on count 2 as 15 years to life, but because it makes no mention of section 186.22, subdivision (b)(5), or a minimum parole eligibility period, it is ambiguous. The minutes and the abstract of judgment should be corrected accordingly.

---

finding increases the minimum parole eligibility period to 15 years. (*People v. Johnson* (2003) 109 Cal.App.4th 1230, 1239.) The 15-year minimum parole eligibility period "is imposed in lieu of the determinate enhancement under [section 186.22,] subdivision (b)(1), not in addition to it. [Citation.]" (*Ibid*.)

16

## IV. Presentence custody credit

Defendant claims he is entitled to six additional days of presentence custody credit. Defendant was given 587 days, the number of actual days in custody as represented by defense counsel at the time of sentencing. Now defendant claims he was arrested April 1, 2010, and was in custody until sentencing on November 17, 2011, a total of 596 days. Respondent contends defendant is entitled to only one additional day because he was arrested initially due to a gang injunction violation and the murder complaint was not filed until April 9, 2010. We find no support in the record for either contention.

Defendant contends that the pre-conviction probation report (prepared in October 2010) shows that he was arrested in this case on April 1, 2010, and that the report does not indicate that he was in custody for any other reason at that time. Defendant is mistaken. The probation report does in fact state an arrest date of April 1, 2010, on pages 2 and 10. However, on page 5, the report states, "The defendant was later arrested while in custody in Los Angeles County Jail on an unrelated matter."

Presentence custody "credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted." (§ 2900.5, subd. (b).) Whenever the possibility exists that duplicate credit might be given, the defendant has the burden to establish that his custody related to the same conduct for which he has been convicted. (*People v. Bruner* (1995) 9 Cal.4th 1178, 1193, 1194) A showing of strict causation is required. (*Id.* at p. 1180.) Thus, the defendant must show "he could have been free during any period of his presentence custody but for the same conduct that led to the instant conviction and sentence." (*Id.* at p. 1195.) Defendant is not entitled to credit for time which is wholly unattributable to the case in which he was convicted, even when the unrelated case is dismissed, resulting in no credit. (See *People v. Huff* (1990) 223 Cal.App.3d 1100, 1105.)

Respondent refers to discussions during a pretrial hearing regarding when defendant's right to counsel attached. Detective Ramirez testified he presented the case to the district attorney for filing on April 7, 2010. Both counsel stipulated the prosecutor

17

signed the complaint containing the instant charges on April 7, 2010, and that the complaint bears a file stamp of April 9, 2010, the day counsel was appointed. It was on April 7, 2010, that Detective Ramirez informed defendant that he was a suspect in this case, informed him of his *Miranda* rights,[8] interviewed him, and then placed him in the same cell as Kill Kill. Later, defense counsel represented his review of the Sheriff's Department website and his conversation with defendant indicated there was a hold relating to this case placed on defendant at the time of his arrest for the injunction violation, and that bail was set at $3,000,000. The prosecutor represented to the court that defendant had been arrested on April 1, 2010, for a misdemeanor violation of section 166, subdivision (a)(4). At defense counsel's request, the court later reviewed the misdemeanor file, and found no hold or bail relating to this case. Thus, the earliest defendant has shown he was not free to go on the instant charges was April 7, 2010, when Detective Ramirez presented the case to the district attorney and the complaint was signed.

Nevertheless, nothing in evidence shows a disposition for the misdemeanor charge; the record thus does not indicate whether defendant was given credit in that case for the time in custody prior to the filing of the complaint in this case. Defendant has thus failed to meet his burden to demonstrate that any time prior to April 10, 2010, was wholly attributable to the current charges. As defense counsel's concession at sentencing of 587 days has not been shown to be erroneous, we conclude that defendant is not entitled to additional credit.

## DISPOSITON

Defendant's sentence as to count 2 is modified to impose a term of life in prison with a 15-year minimum parole eligibility period pursuant to section 186.22, subdivision (b)(5), plus a consecutive firearm enhancement of 25 years to life pursuant to section 12022.53, subdivision (d). The superior court is directed to correct its minutes to reflect the modified sentence and to delete that the sentence was "enhanced by the

---

[8]     See *Miranda v. Arizona* (1966) 384 U.S. 436, 444-445.

18

186.22(b)(1)(C) Penal Code allegation."  The court is further directed to issue an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.  As so modified, and in all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.*
FERNS

_____
* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.